* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gillen and the briefs and arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of Deputy Commissioner Gillen. *Page 2 
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. Defendant-employer's workers' compensation insurance coverage was provided by Legion Insurance Company on November 2, 1999.
4. An employment relationship existed between plaintiff and defendant-employer on November 2, 1999.
5. Plaintiff was born on August 29, 1955. He was 44 years old on the date of his compensable injury and 53 years old on the date of the hearing before the Deputy Commissioner on July 7, 2009.
6. Plaintiff's average weekly wage is $844.00, yielding a compensation rate of $560.00.
7. On November 2, 1999, plaintiff sustained a compensable injury by accident when he slipped and hit his lower back against a staircase while making a delivery for defendant-employer. At that time, plaintiff was a delivery driver based in Charlotte, North Carolina working for Consolidated Personnel and delivering for Kraftmade Cabinetry.
8. Plaintiff did not seek medical treatment for the compensable injury by accident until January 12, 2000. *Page 3 
9. Plaintiff's disability began on or about January 12, 2000.
10. Plaintiff has not provided defendants with any medial records related to his pre-injury condition.
11. Defendants provided plaintiff with medical and disability benefits related to his November 2, 1999 compensable injury. Plaintiff claimed entitlement to additional benefits as a part of the hearing.
12. Plaintiff acknowledged that he has been able to perform some volunteer work at the Charlotte office of the American Red Cross.
13. Legion Insurance Company was declared insolvent by an Order of the Wake County Superior Court, issued on November 1, 2002. Thus, this claim was referred to the North Carolina Insurance Guaranty Association (NCIGA) for further handling, pursuant to N.C. Gen. Stat. § 58-48-1 et seq.
14. Following the Order of Liquidation against Legion on November 1, 2002, NCIGA activated to fulfill its statutory obligations pursuant to the North Carolina Insurance Guaranty Association Act, N.C. Gen. Stat. § 58-48-1, et seq. NCIGA is a non-profit, statutory association that derives all of its rights and obligations from the provisions of the Act. NCIGA's members consist of all property and casualty insurers licensed to do business in the State of North Carolina.
15 Defendants have paid all mediator fees assessed in all mediations conducted in this matter, pursuant to Rule 7 of the Industrial Commission Rules for Mediated Settlement and Neutral Evaluation Conferences.
16. The issues before the Commission are whether plaintiff is entitled to workers' compensation benefits and/or medical treatment as a result of his admittedly compensable *Page 4 
17. workplace accident of November 2, 1999; and whether attorney's fees should be awarded in this matter under N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * * EXHIBITS
1. The parties stipulated to the admissibility of the following exhibits, which were received into evidence:
 • Exhibit 1: Pre-Trial Agreement;
 • Exhibit 2: Hearing Exhibits on CD.
 • Exhibit 3: Seven pages of documents concerning plaintiff's work with the Red Cross.
 • Exhibit 4: Medical records on CD.
 • Exhibit 5: Additional medical records on CD.
 • Exhibit 6: Correspondence collectively paginated 1-38.
 • Exhibit 7: Industrial Commission forms and filings, collectively paginated 1-112.
 • Exhibit 8: Medical records from Presbyterian Healthcare, collectively paginated 1-11.
 • Exhibit 9: Indemnity payment records, 25 pages.
2. The following were entered into evidence during or after the hearing as exhibits:
 • Exhibit 1: A document entitled "Plaintiff's Additions to Correspondence Noted in Proposed Pretrial Agreement for Hearing of July 7, 2009 Before Deputy Commissioner James C. Gillen."
 • Exhibit 2: Documents concerning plaintiff's 2004 hospitalization. *Page 5 
 • Exhibit 3: Document entitled "Employee Statement of Injury."
 • Exhibit 4: Medical record dated February 10, 2010 from The Rehab Center.
 • Defendants' Exhibit 1: Plaintiff's affidavit and related documents concerning his 1986 hospitalization in Texas, collectively paginated 1-5.
 • Defendants' Exhibit 2: Target Pharmacy records.
 * * * * * * * * * * *
Based upon all of the competent, credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 53 years old at the time of the hearing before the Deputy Commissioner. Plaintiff dropped out of high school at age 16, but attained his G.E.D. when he was 32 years old.
2. On November 2, 1999, plaintiff was a delivery driver based in Charlotte, North Carolina working for Consolidated Personnel and delivering for Kraftmade Cabinetry. Plaintiff sustained a compensable injury by accident when he slipped and injured his back while making a delivery for defendant-employer on November 2, 1999.
3. Defendants filed a Form 60 Employer's Admission of Employee'sRight to Compensation dated January 12, 2000, admitting the compensability of the November 2, 1999 accident and documenting that plaintiff's disability relating to the November 2, 1999 accident began on January 12, 2000. Defendants subsequently have paid temporary total disability benefits and medical compensation related to the November 2, 1999 admittedly compensable injury. *Page 6 
4. Plaintiff first received medical treatment in January 2000 from Dr. Joseph Zuhosky at the Miller Clinic. An MRI eventually revealed an annular tear at L5-S1. Dr. Zuhosky referred plaintiff to Dr. Mark Hartman, an orthopedic surgeon, for a surgical consultation. Dr. Zuhosky also subsequently referred plaintiff to Dr. Kern Carlton at The Rehab Center. Dr. Zuhoski felt that a comprehensive pain rehabilitation program, which included psychological intervention and nurses specifically trained in pain management, was necessary for plaintiff's ongoing treatment.
5. While receiving treatment from Dr. Carlton at The Rehab Center, plaintiff was counseled by psychologist Dr. W. Brian O'Malley. At his deposition Dr. O'Malley stated that he believed that plaintiff's depression and development of suicidal ideations were caused by the injury by accident, based upon plaintiff's response to the pain, the dysfunction, and the interruption in his life. Dr. O'Malley further stated that plaintiff was disabled from any employment as the result of the compensable injury by accident.
6. In April 2001 plaintiff was assaulted by his girlfriend's ex-husband, who cut plaintiff's neck and then committed suicide. Plaintiff was transported to Presbyterian Hospital where he underwent surgery for his wounds. Plaintiff was discharged from the hospital on April 14, 2001.
7. During the period from May 2001 into early 2003, plaintiff was hospitalized numerous times for psychological problems, which included, but were not limited to, suicidal ideations. He received treatment from Dr. James Lee, neuropsychiatrist, and Dr. Richard Gellar, psychiatrist, at Presbyterian Hospital. The treatment plaintiff received during these hospitalizations included electroconvulsive therapy in November of 2002. Dr. Gellar has *Page 7 
continued to provide treatment to plaintiff since May 2001, along with counseling by psychologist Sara Krug.
8. In April 2004 plaintiff was found unconscious in his apartment and was taken to Presbyterian Hospital. Plaintiff seemingly had been unconscious for several days, apparently due to a drug overdose. During his hospitalization plaintiff admitted misusing Hydrocodone. Plaintiff was eventually moved to Beverly Healthcare, a nursing facility. Subsequent to the April 2004 incident plaintiff was treated for several conditions, including treatment for renal failure by Dr. Michael Etomi, as well as treatment for wounds and necrotic tissue by Tammy Hay, D.O.
9. Dr. Hay, a wound care specialist, treated plaintiff for acute decubitus ulcers and necrotic tissue that were present after the April 2004 incident. Regarding the relationship between renal failure and these conditions, Dr. Hay testified "If there is a large enough amount of muscle death, which is myonecrosis, the cellular fragments are tried to be cleared through the kidneys, and it can overwhelm the kidneys such that it can cause renal failure, kidney failure."
10. Regarding the cause of plaintiff's renal failure, Dr. Etomi testified that "rhabdomyolysis is the breakdown of skeletal muscle . . . the acute renal failure [was] secondary to his rhabdomyolysis. . . . the cause of the rhabdomyolysis itself I believe at the time was related to his being found on the floor, apparently for several days, which is consistent with the medical literature on one of the causes of rhabdomyolysis." Dr. Etomi further stated that plaintiff's collapse was due to a narcotic overdose based on the blood levels that were found.
11. Subsequent to his release from Beverly Healthcare, plaintiff struggled with psychological issues including, but not limited to, depression, continued suicidal ideations, and addiction to narcotic pain medications. As a result of these issues, plaintiff has been hospitalized *Page 8 
multiple times, including once in Poplar Bluff, Missouri, where plaintiff had moved to live with his brother in January 2005.
12. Plaintiff had some depression prior to 1999 and had also experienced some substance abuse problems prior to the compensable injury. However, these problems were controlled prior to November 2, 1999, and, before the admittedly compensable injury, plaintiff was physically and psychologically able to live a normal life and work a regular full-duty job without restrictions.
13. Dr. Gellar has continued to treat plaintiff for his depression and other psychological conditions since May 2001. Dr. Gellar believes that due to his severe depression plaintiff cannot reliably sustain work activity and there is only a slim chance that plaintiff will be able to return to gainful employment. Dr. Gellar opined and the Full Commission finds as fact that plaintiff's depression and other psychological problems flowed directly from plaintiff's compensable injury by accident.
14. At his deposition Dr. Gellar testified that plaintiff had authored suicide notes dated June 21, 2009. Regarding plaintiff's veracity, Dr. Gellar explained: "I do not see him as exaggerating his problems to me, and I think that the objective data is how many times he's been hospitalized because of the severity of his depression, his inability to cope demonstrates how severe a problem his depression is for him." Regarding the cause of plaintiff's depression, Dr. Gellar testified that plaintiff's January 15, 2003 hospital admission was "due to the depression stemming from the workplace injury." Dr. Gellar also stated that plaintiff's April 26, 2004 hospital admission was the result of "an overdose suicide attempt" and further that "the overdose was part and parcel of his depression which stems from the workplace injury." He further causally related the 2005 hospital admission in Missouri to the workplace injury. *Page 9 
15. In February 2009 defendants sent plaintiff to Dr. Thomas Gualtieri, a neuropsychiatrist, for an independent medical evaluation. Plaintiff complained to Dr. Gualtieri of depression, anxiety, sleep difficulties, chronic pain, and suicidal ideation. As the result of his examination of plaintiff, Dr. Gualtieri opined that plaintiff's chronic psychological problems and multiple hospitalizations were unrelated to his "minor" back injury. Dr. Gualtieri believed that plaintiff was capable of some work and was not permanently totally disabled.
16. The Full Commission gives greater weight to the expert medical opinions of Dr. Gellar, who has treated plaintiff for over ten years, than to the opinions of Dr. Gualtieri.
17. Subsequent to his compensable injury, plaintiff has been able to perform some volunteer work at the Charlotte office of the American Red Cross. Plaintiff also did a small number of odd jobs around his apartment complex for two seasons. The limited tasks plaintiff completed for his apartment complex included locking the pool gate at 9:00 p.m. In approximately August of 2007, plaintiff helped a sick neighbor by running some errands for her and driving the neighbor to doctors' appointments.
18. James Sheely, who was plaintiff's supervisor during his American Red Cross volunteer work, testified subsequent to the hearing in this matter. Regarding plaintiff's ability to work, Mr. Sheely testified: "It would depend on the job. Bill's ability to focus and attention span, ability to do detail work, I would question that. I would caution a perspective [sic] employer to be wary of that. As far as personality, certainly, he's got a great personality, he's a swell guy, friendly, outgoing. It would just depend on the specific skills for the job if I would recommend him for the job."
19. Plaintiff's volunteer work and quasi-work activities subsequent to November 2, 1999 were sporadic in nature and plaintiff was able to complete these activities as his physical *Page 10 
condition allowed. Plaintiff's activity with the volunteer work and sporadic quasi-work activities subsequent to the compensable injury are not indicative of his ability to attain and sustain competitive employment. Furthermore, this work is not indicative of wage-earning capacity and did not constitute suitable employment.
20. Although plaintiff does not need help with the activities of daily living, plaintiff's sister keeps plaintiff's checkbook and pays his bills.
21. Since 2004, defendants have not paid for numerous medical expenses related to plaintiff's November 2, 1999 admittedly compensable accident.
22. Based upon the greater weight of the credible medical and vocational evidence of record, plaintiff's chronic pain, rhabdomyolysis, renal problems, and psychological issues were and are the direct and natural result of, and causally related to, his November 2, 1999 admittedly compensable injury by accident.
23. The greater weight of the credible medical and vocational evidence of record shows that, as a result of plaintiff's November 2, 1999 injury, and his causally related chronic pain and psychological problems, plaintiff has been totally disabled and therefore unable to earn any wages in any employment beginning January 12, 2000 and continuing.
24. The greater weight of the evidence establishes that the medical treatment plaintiff received subsequent to November 2, 1999, was reasonable and medically necessary, and was reasonably calculated to effect a cure, give relief, and lessen the period of disability from plaintiff's admittedly compensable injury.
25. The greater weight of the evidence establishes that the psychological treatment plaintiff received subsequent to November 2, 1999 was reasonable and medically necessary, and *Page 11 
was reasonably calculated to effect a cure, give relief, and lessen the period of disability from plaintiff's admittedly compensable injury.
26. The evidence in this case does not establish that plaintiff is permanently unable to perform gainful employment of any kind, including light duty positions.
27. The greater weight of the evidence shows that plaintiff has received narcotic pain medications from multiple providers and pharmacies and needs the assistance of a physician and nurse case manager to monitor plaintiff's pain management, possibly including an inpatient pain management program. Regarding a potential abrupt discontinuation of Hydrocodone, Dr. Carlton stated that he would anticipate that plaintiff would experience some withdrawal symptoms and that he would be concerned about plaintiff's risk for suicide.
28. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On November 2, 1999 plaintiff sustained an admittedly compensable accident while working for defendant-employer. Defendants accepted the injury to plaintiff's back as compensable by filing a Form 60. This admittedly compensable injury caused plaintiff's back condition, or materially accelerated or aggravated a preexisting non-disabling condition. N.C. Gen. Stat. § 97-2(6); Brown v. Family Dollar Distrib.Ctr., 129 N.C. App. 361, 499 S.E.2d 197 (1998). *Page 12 
2. Our courts have held that "when the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury likewise arises out of the employment, unless it is the result of an independent intervening cause, attributable to claimant's own intentional conduct."English v. J.P. Stevens Co.,98 N.C. App. 466, 470, 391 S.E.2d 499, 501 (1990) (citations omitted);Roper v. J.P. Stevens Co.,65 N.C. App. 69, 308 S.E.2d 485 (1983), disc. review denied,310 N.C. 309, 312 S.E.2d 652 (1984).
3. In this case, plaintiff's post-injury conditions, including but not limited to, his chronic pain, rhabdomyolysis, renal problems, and psychological conditions experienced subsequent to November 2, 1999 are compensable because they are natural consequences that flowed from his admittedly compensable November 2, 1999 injury. N.C. Gen. Stat. § 97-2(6);English v. J.P. Stevens Co., supra. Plaintiff's admittedly compensable November 2, 1999 accident and consequent chronic pain caused or exacerbated his subsequent psychological problems. Workman v. Rutherford Elec. Membership Corp.,170 N.C. App. 481, 613 S.E.2d 243 (2005); Toler v. Black andDecker, 134 N.C. App. 695, 518 S.E.2d 547 (1999).
4. Defendants admitted the compensability of plaintiff's injury by accident on November 2, 1999 by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff.Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277, disc. review denied,353 N.C. 729, 550 S.E.2d 782 (2001).
5. In order to meet the burden of proving disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury.Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of *Page 13 
production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages.Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution,108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc., supra.
6. Plaintiff has shown by competent medical evidence that, as the result of the compensable injury by accident, he is mentally incapable of work in any employment. Demery v. Perdue Farms, Inc.,supra. Defendants have not rebutted the presumption of plaintiff's continuing disability. Franklin v. Broyhill FurnitureIndustries, 123 N.C. App. 200, 472 S.E.2d 382, cert.denied, 344 N.C. 629, 477 S.E.2d 39 (1996). "[M]ere proof of a return to work is insufficient to rebut the . . . presumption" because "capacity to earn is the benchmark test of disability."Kisiah v. W.R. Kisiah Plumbing,124 N.C. App. 72, 81, 476 S.E.2d 434, 439 (1996), disc. reviewdenied, 345 N.C. 343, 483 S.E.2d 169 (1997). Given the foregoing, and the facts of this case, plaintiff's volunteer work and sporadic quasi-work activities subsequent to November 2, 1999 did not constitute suitable employment sufficient to establish his capacity to earn *Page 14 
competitive wages and were not indicative of his ability to attain and sustain competitive employment. N.C. Gen. Stat. § 97-32;Kisiah v. W.R. Kisiah Plumbing, supra.
7. As a result of his admittedly compensable injury of November 2, 1999 and the resulting conditions, plaintiff is totally disabled from any employment and is entitled, to the extent it has not been paid, to payment by defendants of total disability compensation at the rate of $560.00 per week for the period from January 12, 2000 and continuing until plaintiff returns to work or further Order of the Commission. N.C. Gen. Stat. § 97-29; Calloway v. Memorial Mission Hosp.,137 N.C. App. 480, 528 S.E.2d 397 (2000); Russell v. Lowes ProductDistribution, supra.
8. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, plaintiff is entitled to have defendants provide all medical treatment, including, but not limited to, treatment for his chronic pain, rhabdomyolysis, and renal problems incurred or to be incurred, related to plaintiff's admittedly compensable injury of November 2, 1999 when the medical bills have been approved according to established Industrial Commission procedures. The approved treatment includes, but is not limited to, defendants' payment of all outstanding medical bills related to the November 2, 1999 injury, all amounts owed to Beverly Healthcare, and ongoing treatment provided by Dr. Kern Carlton. N.C. Gen. Stat. §§ 97-25, 97-25.1.
9. Subject to the provisions of N.C. Gen. Stat. § 97-25.1, plaintiff is entitled to have defendants provide any past and future psychiatric treatment related to plaintiff's November 2, 1999 compensable accident when bills for the same have been approved pursuant to Industrial Commission procedures. This treatment includes, but is not limited to, ongoing treatment to be provided by Dr. Gellar and Ms. Krug. N.C. Gen. Stat. § 97-25; Workman v. Rutherford Elec.Membership Corp., supra; Toler v. Black and Decker,supra. *Page 15 
10. In order to be found permanently and totally disabled under the Act, competent medical evidence must show that plaintiff is not able to perform gainful employment of any kind, including light duty positions. Demery v. Perdue Farms, Inc., supra;Errante v. Cumberland County Solid Waste Management,106 N.C. App. 114, 415 S.E.2d 583 (1992). At this time, the evidence in this case does not establish that plaintiff is unable to perform gainful employment of any kind, including light duty positions.Id.
11. Neither party pursued any issue in this matter in an unreasonable manner or without reasonable ground and, therefore, neither party is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff, to the extent it has not been paid and subject to the attorney's fee approved below, total disability compensation at a rate of $560.00 per week for the period from January 12, 2000 and continuing until plaintiff returns to work or further Order of the Commission. Any payments that have accrued shall be paid in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of the November 2, 1999 compensable accident when bills for the same have been approved pursuant to Industrial Commission procedures, subject to the provisions of N.C. Gen. Stat. § 97-25.1. The approved medical expenses include, but are not limited to, payment of any *Page 16 
outstanding medical bills related the November 2, 1999 injury concerning plaintiff's chronic pain, rhabdomyolysis, and renal problems. Furthermore, the approved medical treatment includes, but is not limited to, all amounts owed to Beverly Healthcare and ongoing treatment provided by Dr. Kern Carlton.
3. Defendants shall pay all psychological treatment expenses incurred or to be incurred as a result of the November 2, 1999 compensable accident when bills for the same have been approved pursuant to Industrial Commission procedures, subject to the provisions of N.C. Gen. Stat. § 97-25.1. This treatment shall include, but is not limited to, ongoing treatment provided by Dr. Gellar and Ms. Krug.
4. A reasonable attorney's fee of 25% of the compensation due plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid as follows: 25% of any lump sums due plaintiff shall be deducted and paid directly to plaintiff's counsel; thereafter, plaintiff's attorney shall receive every fourth compensation check due plaintiff.
5. Defendants shall pay the costs due the Commission.
 ORDER
Based upon the substantial evidence of plaintiff's significant problems involving misuse of narcotic pain medications, IT IS HEREBY ORDERED that Dr. Carlton shall direct all pain management care, including any inpatient rehabilitation for narcotic abuse. If not already done, defendants shall assign a nurse case manager to provide further monitoring and assistance in the management of plaintiff's chronic pain. Further, plaintiff shall provide to Dr. Carlton, the nurse case manager, and defendants all relevant physician, CMMS, and pharmacy records of plaintiff's narcotic/opiate pain prescriptions.
This 17th day of November, 2010. *Page 17 
 S/___________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/___________________ LINDA CHEATHAM COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1